## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHAWNEE O'DONNELL | : | CIVIL NO. 3:15CV01191(AWT) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT | : | |
| HEALTH CENTER | : | |
| Defendant | : | November 17, 2016 |

## AMENDED DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT[1]

The plaintiff Shawnee O'Donnell (hereafter "plaintiff") filed her one count complaint on August 5, 2015 for retaliation against the Defendant University of Connecticut Health Center ("defendant" or "UCHC") under Title VII of the Civil Rights Act of 1964 and as amended 1991, 42 U.S.C. §2000e et seq. and 42 U.S.C. §1981a. (Doc. #1).  UCHC filed its Answer and Affirmative Defenses on September 24, 2015.

Defendant UCHC moves for summary judgment based on facts set forth in defendant's Local Rule 56(a)(1) Statement of Undisputed Facts.  As discussed more fully below, UCHC is entitled to judgment on the entire complaint because plaintiff has failed to establish a genuine issue of material fact that Defendant retaliated against her in violation of Title VII.

---

[1] A correction was made on page 19 of the brief.

## I.   FACTS

The defendant incorporates its Local Rule 56(a)(1) Statement of Material Facts with supporting materials.  The following is a summary of key facts with reference to defendant's statement of material facts by paragraph.

### A.  Summary of Key Facts

The defendant UCHC hired plaintiff as a Licensed Practical Nurse ("LPN") in its Correctional Managed Health Care (hereafter "CMHC") unit on October 4, 2013. CMHC is a sub-division of UCHC that provides all medical care for prison inmates within the State of Connecticut Department of Corrections ("DOC"). Although employees of UCHC, CMHC employees are governed by DOC policies (many referred to as "Administrative Directives").

UCHC hired plaintiff as a "per diem" Licensed Practical Nurse ("LPN"), which is a temporary position used to fill in for LPN's who are absent on a particular shift.  Plaintiff's per diem LPN hours of work were intermittent but approximately 24 to 32 per week, with her primary work location at Osborn Correctional Institution, a large state prison housing 1,983 male inmates, a high percentage of which are registered sex offenders.  (Exhibit B, Affidavit of Captain Luis Colon, ¶4).

As a per diem LPN, the terms and conditions of plaintiff's appointment were subject to 6 month review to determine her continued employment. Upon being

hired, plaintiff underwent a new employee orientation process and was provided all applicable policies including the DOC Handbook that contained applicable policies including policies regarding attendance (and guidelines on reporting any absences) under the DOC Administrative Directive 2.11, "Employee Dependability."  Plaintiff signed off on receipt of these policies indicating her understanding, acknowledgment and agreement to comply with the policies (Defendant's Statement of Undisputed Facts [hereafter "SOF"] ¶¶ 3-7).

On January 10, 2014, plaintiff was offered and accepted a "durational" LPN position at Osborne.  An employee in a durational position, works full-time hours for a specified period of time (e.g., 6 months), corresponding to the period of absence by the incumbent employee in that position who is on leave (e.g., maternity leave).  Plaintiff's durational LPN position extended from January with an end date of July 9, 2014.  As reflected in the written agreed-upon terms of her durational appointment, plaintiff signed and acknowledgment that "you cannot be guaranteed continued employment beyond the anticipated end date; therefore, termination is without right to appeal." (SOF, ¶¶ 8, 9).

A "durational" is deemed a "temporary" position under the governing collective bargaining agreement ("CBA").  Article 1 Section 4 of the CBA states that temporary employees have no guaranteed employment beyond the termination point of the appointment. (SOF, ¶10).

### Plaintiff's Record of Attendance and Unauthorized Leave

After starting in her durational LPN position in January of 2014, plaintiff's attendance became problematic under the governing DOC attendance policy (*see,* SOF¶7).   Notably, CMHC relies on consistent attendance by their medical personnel such as LPNs, and the DOC Dependability policy which sets out the absence/tardiness rules, states that employees who call in sick but have exhausted any sick leave can use other accrued time off or, they can submit a written request for authorized leave without pay.  Failure to follow this policy results in an "unauthorized leave without pay" subject to three levels of counseling and progressive discipline.  (SOF ¶7; *see in particular,* DOC Employee Handbook and the Employee Dependability policy, (Defendant Exhibits 23 and 24).

On February 3, 2014, Health Services Administrator ("HSA") Brian Liebel, the plaintiff's supervisor for time and attendance, counseling and discipline,  issued the plaintiff a "first counseling notice-exhaustion of sick leave," as plaintiff had been absent on "unauthorized leave" for part of the day as she had exhausted her leave accrual.  HSA Liebel informed plaintiff that "you called out sick without sufficient sick accruals to cover the absence adding that the counseling notice was "meant to impress upon you the importance of following established procedures."  HSA Liebel concluded the notice stating "[p]lease be advised that if this continues progressive discipline will be forthcoming." (SOF, ¶¶14, 15)).

Plaintiff's failure to comply with the DOC attendance and absenteeism policy continued.  On February 19, 2014, HSA Liebel issued plaintiff a "second Counseling Notice- exhaustion of Sick Leave."  This second notice resembled the first in that

Liebel informed plaintiff that part or all of her work day on February 13, 2014 had been recorded as Unauthorized Leave without pay due to exhaustion of her sick leave accruals.  Liebel again impressed upon plaintiff that if this continued (i.e., plaintiff calling in sick without sick leave accruals) "progressive discipline will follow."[2]

Plaintiff's absenteeism and unauthorized leave continued notwithstanding the two counseling notices.  On April 3, 2014, HSA Liebel issued plaintiff an "Article 22 Section 10 letter," which refers to a provision of the Collective Bargaining Agreement ("CBA") between the State of Connecticut and the Union representing employees such as the plaintiff.  An Article 22 Section 10 letter informs the recipient that their absence is considered an "abuse of sick leave."  HSA Liebel notified plaintiff that her continued absences were considered "an abuse of sick leave" due to her calling out sick on March 31, 2014, and that if there "are additional absences from work, sick pay may be denied," her "unsatisfactory attendance pattern may be reflected in [her] service rating, and may subject [her] to disciplinary action."  Again, by issuing this letter rather than a discipline or separating her from employment as she was a temporary employee, HSA Liebel afforded plaintiff additional leniency.  Article 22 Section 10 applies only to permanent employees and does not apply to durational employees as they are deemed temporary employees under the CBA.  Temporary employees (i.e., per diem

---

[2] Of note, a strict reading of the DOC Employee Dependability policy could have resulted in the plaintiff being given a written reprimand as the second absence occurred within six months of the first absence (SOF, ¶¶16, 17; see, DOC Dependability Policy "Second Occurrence: "Employee shall be given a written reprimand if the second occurrence is within six (6) months of the prior occurrence." in SOF ¶7, Exhibit 24).

or durational) with time and attendance problems will often be separated from employment.  (SOF ¶¶18-20; *see in particular,* Exhibit C, Affidavit of Sylvia Santos-Flickinger, Principle Labor Relations Specialist for UCHC, ¶9).

### Department of Correction Notifies  Plaintiff's Supervisor About Plaintiff's Attire and Requests That She Wear Appropriate Clothing For the Prison Environment Consistent With Express DOC policy

In or about mid to late April of 2014, Captain Luis A. Colon, who was the second shift commander for the Osborne Department of Correction ("DOC") inmate custody operations, contacted the second shift Nursing Supervisor Rob Ramonas, plaintiff's clinical supervisor.  Captain Colon informed Ramonas that it had come to his attention that the plaintiff was wearing tight-fitting jeans when performing her duties as a nurse that were in contravention of DOC policy regarding proper attire by non-uniformed personnel in the prisons.  The policy in question, DOC Administrative Directive 2.13 entitled "Employee Work Attire, Personal Appearance and Identification," provides in relevant part: "[n]on-uniformed personnel shall wear clothing that is…sized appropriately as not to reveal or abnormally accentuate the body." (SOF ¶¶21, 22; *See* Exhibit 6, DOC Administrative Directive, 2.13, page 2 of 7, section 5.D.1.d ).

Captain Colon requested that Ramonas speak to the plaintiff and ask her to wear more appropriate attire.  Captain Colon's concern was that male inmates were distracted when plaintiff was in the custody areas where inmates were located and were gawking at her, whistling at her and making derogatory comments to her. Colon's concern was that as Osborn has a high percentage of inmates (prison

population of 1,983 male inmates) who are registered sex offenders, he was concerned for plaintiff's safety. (SOF, ¶23, *see, Exhibit B,* Affidavit of Captain Luis Colon). Ramonas spoke with the plaintiff about Captain Colon's request. Although plaintiff later complained about her discussion with Ramonas over this topic, plaintiff complied with Ramonas' request that she wear more appropriate attire and the concern raised by Captain Colon was taken care of. (SOF, ¶24).

### Plaintiff's April 22, 2014 "Incident Report" complaining about Conversations with Nursing Supervisor Robert Ramonas and Health Services Administrator Brian Liebel

On April 22, 2014, the Plaintiff submitted a written DOC incident report in which she complained about three communications with her nursing supervisor Robert Ramonas and one with Health Services Administrator Brian Liebel. (SOF, ¶¶29-31).[3] Regarding Ramonas, plaintiff's incident report complaint first described the meeting she had with nursing supervisor Ramonas about her jeans and which she stated she "felt very uncomfortable."

Second, plaintiff's incident report also stated that she had been called into Ramonas' office "just to talk."

Third, plaintiff recounted a discussion with Ramonas who told her that DOC staff had "concerns regarding inmate Eugene Guy who was an inmate hospital worker." (SOF ¶¶25, 26). Ramonas told plaintiff that the inmate worker had been seen "out of place" on a floor he was not assigned to and where plaintiff worked 25 to 30 percent of her time. Ramonas was concerned about staff reports that plaintiff

---

[3] In her present complaint of Title VII retaliation, plaintiff claims that this incident report constituted protected "opposition" conduct under Title VII. As argued below, this claim fails.

may have been in some form of personal contact with the inmate which is strictly prohibited under DOC's "undue familiarity" policy. (*see,* SOF ¶¶26-29).

Plaintiff wrote in her incident report that Ramonas told her that "custody" (i.e., DOC uniformed prison staff) was watching the inmate "regarding [him] being out of place." Plaintiff informed Ramonas that she was "not comfortable with Custody 'watching' inmate Eugene Guy and [she] did not want [her] name involved." (SOF, ¶¶ 27, 28)

In fact, Ramonas had the inmate reclassified to a different location in the institution to "get him out of the medical unit completely," to "stop any perceptions that [plaintiff] was exhibiting undue familiarity to this particular inmate worker." (SOF, ¶ 28). Plaintiff admitted that Ramonas was informing her about this inmate being out of place was giving her a "heads up," and that this discussion "wasn't inappropriate." (SOF, ¶ 29).

In her incident report, plaintiff also complained about a phone call she had received from Health Services Administrator Liebel, in which he inquired about a lengthy phone call she had from a phone at Osborn. Plaintiff's phone number had come up on the DOC Osborn "call list" (indicating lengthy telephone calls made into the institution, in which DOC has a policy to investigate whether the phone call is appropriate). Liebel called plaintiff as part of his job responsibilities as a Health Services Administrator to investigate CMHC telephone calls that come up on the call list. The plaintiff explained to HSA Liebel that she had been speaking with another nurse. Upon her explanation, the matter was resolved. (SOF, ¶31).

Plaintiff claimed that these four conversations (Ramonas' discussion with her about DOC's concern with her attire, Ramonas calling her into his office "just to talk," Ramonas speaking with her about the inmate hospital worker, and HSA Liebel's speaking with her about the lengthy telephone call) created a "hostile environment." (SOF, ¶26).

Plaintiff's incident report was referred to the Office of Institutional Equity ("OIE") and specifically to EEO Specialist Robert Camilleri.  OIE is an independent department within UCHC created by state statute (Conn. Gen. Stat. §46a-68(b)(4)(A) charged with investigating discrimination complaints and mitigate or prevent any harm caused by discriminatory conduct.  EEO Specialist Camilleri contacted the plaintiff and consistent with the practice of his office sent plaintiff a form to enable her to file a complaint with more factual detail.  It is uncontroverted that plaintiff did not contact Camilleri or submit the form with any details. Nevertheless, Camilleri evaluated plaintiff's claim under the presumption that the claim was asserting a sexual harassment complaint,[4] and concluded that the conversation between Ramonas and plaintiff regarding her tight-fitting jeans did not constitute sexual harassment.  (SOF,  ¶¶ 30-35).

### Plaintiff's Voluntary Resignation and Claim That UCHC Retaliated Against Her For Not Allowing Her To "Return" to a Per Diem LPN Position

On May 20, 2014, the plaintiff sent an email to Human Resources Officer Noreen Logan stating that she was aware that her durational LPN position would

---

[4] Principle Labor Relations Specialist Sylvia Flickinger decided that plaintiff's incident report about Nursing Supervisor Ramonas speaking with plaintiff about her tight-fitting jeans appeared to complain about sexual harassment.

end on July 9, 2014, but "was wondering if I am able to end earlier than the original

end date."  In a response the same day, Logan stated: "You certainly can resign

earlier if you'd like.  A 2 week notice would be required.  If you decide to resign,

please send notification to your HSA [Brian Liebel] and cc me.  Your notification can

be in an email message if you like." (SOF, ¶36, 38).

Plaintiff emailed HSA Liebel the same day (May 20, 2014), with copies to

Human Resources Officer Logan and Nursing Supervisor Ramonas), stating:

> Unfortunately, I will not be able to finish the durational position to
> term, which is July 9th.   I am giving my two weeks notice to return
> back to per diem status.  My last day as durational will be June 30,
> 2014.  I thank you for the opportunity, but some personal matters
> came up and I am unable to take a FMLA on durational.  A per diem
> schedule will work best for me.  I you have further questions, please
> feel free to contact me."

(SOF, ¶40).  In reply to plaintiff's resignation, HSA Liebel stated to plaintiff:

> This is to notify you that we are accepting your resignation effective
> immediately.  As your durational will be ending on Thursday May 29,
> 2014 we will keep you on until that time.  Effective May 29, 2014, you
> will no longer be a durational employee.  ***You will need to re-apply for
> any Per Diem positions***.  You may apply for any future LPN vacancies
> (permanent, Durational or Per Diem) on our website
> https;//jobs.uchc.edu.  You will need to provide your ID and any other
> CMHC issued identification to your Supervisor by end of shift May 29,
> 2014.

(SOF ¶41, emphasis added).

On May 23, 2014, Human Resources Officer Logan followed up HSA Liebel's

email with a letter to the plaintiff confirming that her durational LPN position

would be ending Thursday May 29, 2014, adding: "***You may apply for future LPN***

***vacancies (permanent, durational, or per diem)*** on our website…" (SOF¶43,

emphasis added). It is uncontroverted that plaintiff did not seek to withdraw her resignation from her durational LPN position, nor did she ever subsequently apply for a per diem LPN position. (SOF, ¶¶42, 67).

After plaintiff's resignation had been accepted and was notified that May 29, 2014 would be her last day, the plaintiff was absent on her scheduled work days: May 24, 25, 26, 27, and 29, 2014. Plaintiff called in sick on all days except May 29th. However, as required under the DOC Employee Dependability policy, plaintiff failed to provide a Medical Certification to her immediate supervisor or designee (HSA Brian Liebel) for these absences. The policy unequivocally requires such a Medical Certification for absences due to illness for five or more days. As such, under the policy, plaintiff's absences were deemed "unauthorized absences." (SOF, ¶¶53,54).

Plaintiff sent Human Resources Officer Logan an email on May 26, 2014 stating that HSA Liebel "not allowing me to return to per diem status is due to retaliation," referring to the statements she submitted in her incident report. She also claimed that supervisor Ramonas told her that "when she took the durational position, that I will automatically be placed back on per diem status." Plaintiff then added that she had been in the hospital since May 24, 2014 and would not be back to work by May 29th." (SOF, ¶ 51).

On May 29, 2014, plaintiff's union representative John Kiang sent an email to Human Resources Officer Logan stating that plaintiff had told him (Kiang) that Logan had told her that it "would be fine" for her to "go back to per diem from

durational before the end term of July 9th."[5]  Logan responded on May 30, 2014 stating that "]plaintiff] resigned and her resignation was accepted."  Logan added that "there is no guarantee of a Per Diem position when her durational would have expired," and that "[w]ork performance and attendance are considered at the time of a placement in any position, including Per Diems.  As a durational, she received TWO counseling letters, and an Article 22 letter for attendance, dating back to April 3, 2014.  There were obvious concerns regarding her dependability.  She can apply for a future Per Diem position, however attendance is considered when she applies for a Per Diem position, as reliability is an important consideration." (SOF, ¶ 50; Exhibit 21, Email from and to John Kiang and Noreen Logan).

On June 4, 2014, Human Resources Officer Logan sent plaintiff a letter stating that her resignation had been accepted on May 23, 2014, with an effective date of May 29, 2014, and that during this period she was expected to continue to report to work.  Logan further stated with reference to the five days of absences during this period: "Due to your failure to report to work during this period, your Resignation is being marked as Not In Good Standing."  (SOF, ¶58).  Of note, plaintiff's May 26th email to Logan claiming she was in the hospital, did not excuse her absences of five days as required under the DOC policy which required her to submit a Medical Certification within 5 days of her return to work. (SOF ¶53)[6].

---

[5] It is an indisputable fact as reflected in her May 20, 2014 email Logan had never told plaintiff that she could go back to a Per Diem position. (*see,* SOF¶¶37-40).

[6] As argued below, plaintiff's May 26th email to Logan that she had been in the hospital does not comply with the DOC Employee Dependability policy on notification of absence, and therefore plaintiff cannot use this email to shield herself from the consequences of failing to comply with

Designating her resignation as "not in good standing" was fully consistent with UCHC personnel policies, DOC's Dependability policy, and State Personnel Regulaitons.  (SOF, ¶53-55).

### Plaintiff's Union Grievance Claiming that She Had Been "Terminated Without Just Cause"

Not happy with the outcome of her resignation and believing she was entitled to go back to a per diem position, on June 12, 2014 the plaintiff filed a union grievance claiming that she had been "terminated without just cause" pursuant to the union collective bargaining agreement.[7]  The grievance was heard by the Office of Labor Relations ("OLR") (Attorney Judy Lederer) on June 18, 2014.  Notably, plaintiff submitted at the grievance hearing *for the first time*, a doctor's note dated June 18, 2014 stating that she should be excused from work for May 23, 2014 through May 30, 2014.  This doctor's note was ineffectual as it had *not* been provided to her direct supervisor and was not produced within the time period required under DOC attendance policy. (SOF, ¶ 62)

In the formal "answer" to the grievance dated October 31, 2014, Attorney Lederer wrote:

> "This grievance was filed by [the plaintiff] as a termination, but that mischaracterizes the underlying facts.  [Plaintiff] was a durational employee who had accepted the position after working in a per diem capacity.  She became a durational employee as of January 7, 2014, and tendered her resignation on May 20, 2014.  While the grievant claimed she was giving there is nothing to indicate that a per diem position was an option for her.

---

her obligation to provide a Medical Certification to her supervisor (HSA Brian Liebel) for her 5 days absence- her 5 day absence was an "unauthorized leave."

[7] As argued below, plaintiff's union grievance was wholly meritless and indeed frivolous as she was clearly not terminated as she had voluntarily resigned (and never sought to rescind her resignation).

> There had been ongoing issues with [plaintiff's] ability to come to work, and there were frequent absences noted.  After she tendered her resignation she did not return to UCHC but one day.  That was 5/22/14, when she arrived over two hours late for her shift.  As [plaintiff] failed to report to work during the two week notice period, the [defendant] Agency resigned her 'not in good standing.'  Given that she was not terminated, there is no [CBA] violation, and the grievance is denied as non-arbitrable."

(SOF, ¶ 64). Of note, the CBA grievance and arbitration procedure provides that a grievant "assents to the last attempted resolution by failing to timely appeal said decision."  The record shows that neither plaintiff nor her union appealed this grievance answer to arbitration.  (SOF, ¶65).

Further, the record shows that plaintiff never applied for a per diem position after she resigned her employment with an effective date of May 29, 2014 notwithstanding three per diem vacancies posted as job openings on January 15, 2015, October 26, 2015, and August 18, 2016.  (SOF,¶ 68).

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.*P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir.2010). Once the moving party has asserted facts showing that the nonmoving

party's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.2010) (citations omitted). Only disputes relating to material facts— i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record ... that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir.2007) ("Incontrovertible evidence relied on by the moving party ... should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

The record must be construed in the light most favorable to plaintiff, *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102 (2d Cir.2013), but "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient" to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Further, "conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 151 (2d Cir.2007). Indeed, " '[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.' " *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir.2004) (*quoting Abdu–Brisson v. Delta Air Lines*, 239 F.3d 456, 466 (2d Cir.2001)).

II.   **ARGUMENT**

   A. **The Defendant Is Entitled To Judgment As A Matter Of Law Because Plaintiff Cannot Satisfy Her Burden Of Proving A Prima Facie Case of Title VII Retaliation or That Defendant's Actions Were Either Pretextual Or the "But-For" Cause of the Alleged Adverse Action**

The plaintiff's retaliation prima facie case fails based on uncontroverted evidence that she did not engage in protected conduct, that she did not suffer any adverse action in being informed that she could not become (or go back to) a per diem position after her resignation from her durational position.  Plaintiff's prima facie case further fails based on a complete lack of causation evidence that UCHC retaliated against her based on protected activity.

Moreover, assuming that the plaintiff could satisfy her prima facie burden, there is no evidence that plaintiff can rely on to satisfy her ultimate burden to rebut UCHC's non-retaliatory basis for informing plaintiff that she did not have the right or entitlement to go back to a per diem position.  Ultimately, plaintiff cannot prove

that UCHC's desire to retaliate against her was the "but-for" cause of the challenged employment action.

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Thus, "[a]n employment decision ... violates Title VII when it is 'based in whole or in part on discrimination.' " *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.2008) (*quoting Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)). Title VII also prohibits discrimination against an employee because he "opposed any [unlawfully discriminatory] practice" or "made a charge, testified, assisted, or participated in" a discrimination proceeding or investigation. 42 U.S.C. § 2000e–3(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (hereinafter "Burlington Northern").

Plaintiff's retaliation claim is governed by the McDonnell Douglas burden-shifting framework. *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70, 73-74 (2d Cir. 2015); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Accordingly, plaintiff must present a prima facie case by showing (1) that she participated in a protected activity known to the defendant; (2) that the defendant took an employment action disadvantaging her; and (3) that there exists a causal connection between the protected activity and the adverse action. *Ya-Chen Chen v. City University of New York,* 805 F.3d 59, 70 (2d Cir. 2015); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 257 (2d Cir. 2014).

If plaintiff succeeds in making this prima facie showing, this creates a "presumption of retaliation, which the defendant may rebut by articulating a legitimate, non-retaliatory reason for the adverse action." *Ya-Chen Chen*, 805 F.3d at 70.   If defendant meets that burden with such explanation, "the presumption of retaliation dissipates, and the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2533 (2013); *Ya-Chen Chen*, 805 F.3d at 70.

## B.   Plaintiff Cannot Establish A Prima Facie Claim For Retaliation

To overcome a motion for summary judgment, a plaintiff must first satisfy an initial burden of proving by the preponderance of the evidence a prima facie case of discrimination.  *Bento v. City of Milford*, Civil Case No. 3:13-CV-01385 (VAB), 2016 WL 5746340, *8 (D.Conn. Sept. 30, 2016).  Plaintiff must show (1) conduct by the plaintiff that is protected activity under Title VII; (2) that defendant knew of the protected activity; (3) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity." *Cox v. Onondaga Cnty. Sheriff's Dep't,* 760 F.3d 139, 145 (2d Cir.2014). In this case, plaintiff cannot establish facts regarding the first, +third, and fourth elements of a prima facie.  For purposes of this motion, defendant concedes that plaintiff submitted her April 22, 2014 incident report, which communicated what she alleges in the complaint constituted opposition to protected conduct.

### 1.  Plaintiff Did Not Engage In Protected Conduct Under Title VII

A "protected activity" for the purposes of a Title VII retaliation claim generally involves filing a formal complaint; however, making complaints to management has been deemed protected activity.  *Bento v. City of Milford,* 2016 WL 5746340 at *9, *citing, Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990). "To qualify as protected activity, an employee's complaint must have been based on "a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir.2013) (quotation omitted and emphasis added). However, "mere subjective good faith belief is insufficient[;] the belief must be reasonable and characterized by objective good faith." *Id.* at 16 (quotation omitted and emphasis in original). The reasonableness of the plaintiff's belief is assessed in light of the totality of the circumstances, and "[a] plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form." *Id.* at 14.   "Generalized complaints about a supervisor's treatment are insufficient." *Bento,* 2016 WL 5746340 at *9; *see, Drumm v. SUNY Geneseo Coll.,* 486 Fed.Appx. 912, 914 (2d Cir. 2012)("[P]laintiff's allegations that her supervisor 'berated' her and made other harsh comments…amount only to general allegations of mistreatment, and do not support an inference that plaintiff had a reasonable good faith belief that she was subject to gender discrimination.").

Plaintiff alleges in her complaint that she had opposed sexual harassment by her nursing supervisor Robert Ramonas (Complaint, ¶90), however, there is absolutely nothing that plaintiff "opposed" that even implicates Title VII sufficient to constitute protected conduct.

Plaintiff's alleged protected conduct was her written incident report dated April 22, 2014.  (Exhibit 7).  This incident report complained about four interactions with nursing supervisor Robert Ramonas and Health Services Administrator Brian Liebel: (1) Ramonas speaking with her that DOC was concerned about the jeans she wore and when plaintiff said other nurses wear jeans, Ramonas said she was prettier than them, (2) Ramonas telling her that DOC was monitoring a hospital worker inmate who was observed "out of position" and seen in plaintiff's work area and for plaintiff to be aware of this for her benefit as there were concerns that plaintiff may be violating DOC policies on relationships with inmates, (3) being called into Ramonas' office "just to talk," and (4)  HSA Liebel's phone call to plaintiff conducting a facility practice to inquire about plaintiff being involved in a lengthy telephone call that came up on the Osborn Correctional "call list."  (*See,* plaintiff's incident report, Exhibit 7).  Based on these communications, plaintiff claimed in her incident report: "I feel like I am working in a hostile environment, and it is difficult to come to work." (*Id.).*

Notwithstanding plaintiff's subjective claim, the claims in plaintiff's incident report do not constitute opposition to prohibited discrimination under Title VII.  An employee's conduct will constitute protected activity "so long as the employee has a

good faith, reasonable belief that the underlying challenged actions of the employer violated the law. . . . And not just any law"; the employee must believe he was "opposing an employment practice made unlawful by Title VII." *Kelly*, 716 F.3d at 14. Moreover, "[a] plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form." *Id.* at 15. A review of what plaintiff purportedly "opposed" in her incident report shows that plaintiff's complaints do not constitute protected conduct.

### a. Ramonas Discussion With Plaintiff About Her Attire and "Just To Talk" Does Not Implicate Conduct Prohibited By Title VII

With respect to Ramonas conveying DOC's concern with plaintiff's tight-fitting jeans- this communication is entirely reasonable, appropriate in the work setting of a large male prison (close to 2,000 inmates, a large percentage of which are sex offenders), and does not constitute prohibited discrimination no matter what plaintiff subjectively believes.

There is no dispute that, in fact, Department of Correction Captain Colon contacted nursing supervisor Ramonas to speak with plaintiff about her tight-fitting jeans that raised a safety and security issue in the prison environment. As set forth in his affidavit, Captain Colon was concerned for the safety and security of not only staff and inmates, but plaintiff herself.  She had been wearing tight-fitting jeans that caused a disruption in the inmate cell block area where plaintiff was present in the course of her duties as an LPN.  Colon noted that he received reports of increase in noise, catcalls, and that plaintiff's tight-fitting jeans were in contravention of DOC Administrative Directive 2.13 section 5.D.1 which provides in part: "Non

uniformed personnel shall wear clothing that is sized appropriately as not to reveal or abnormally accentuate the body." (SOF, ¶¶21, 22).

There is no factual dispute that Ramonas spoke with plaintiff about Captain Colon's request and Colon's request that plaintiff wear more appropriate attire was satisfied as plaintiff "started wearing scrubs every day."  (SOF, ¶¶23, 24).

Plaintiff's allegation that Ramonas stated the plaintiff was "pretty" in response to her comment that other nurses wear jeans, even if true, cannot be characterized as prohibited conduct under Title VII upon which a cognizable claim of opposition can be established.   There is no factual dispute that this was a work-related issue that had come up in a prison setting, which DOC had directed nursing supervisor Ramonas to address with plaintiff, which he did, and which resolved the problem.  As the Second Circuit held in *Kelly, supra,* which if fully applicable here, plaintiff did not allege that Ramonas (or HSA Liebel) "engaged in sexually explicit behavior or conversations in the office, or that [Ramonas or Liebel] took *any* actions or made any statement[s] that were of a sexual or gender-specific nature that could be perceived as 'demeaning of women.'" *Kelley,* 716 F.3d at 16.  Indeed, *Kelly* further held that is instructive here:  "Nothing in the complaint indicates that 'sexual discourse displaced standard business procedure in a way that prevented [plaintiff] from working in an environment in which she could be evaluated on grounds other than her sexuality." *Id.* at 16.

Further, plaintiff's claim in her April 22, 2014 incident report that Ramonas would call her into his office "just to talk" is frivolous on its face and cannot be

deemed prohibited conduct under Title VII as these comments (which plaintiff states in her incident report) are hardly sufficient to constitute conduct prohibited by Title VII. *Kelly,* at 15, *citing, Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)(holding that there was no "semblance of gender-oriented motivation in the events or conversations" complained of such as being "improperly required to work on her employer's personal matters.").

### b.  Ramonas Discussion About The Inmate Worker

Regarding plaintiff's complaint about the inmate communication, Ramonas spoke to plaintiff because the inmate was observed in her work area and he wanted to protect plaintiff against any claim that she was engaging in a personal relationship with an inmate which is strictly prohibited under DOC policy against "undue familiarity" between staff and inmates. (*see,* SOF, ¶27).  Plaintiff has acknowledged in her deposition that Ramonas was actually giving her a "heads up" about the issue with the inmate and his discussion with her about this "wasn't inappropriate."  (SOF¶29, Exhibit E, O'Donnell Depo., pp. 54, 57). Not only does this communication not implicate prohibited conduct under Title VII, plaintiff has admitted that Ramonas' statement to her was appropriate.

### c.  HSA Liebel's telephone Call To Plaintiff about the "Call List"

Similarly, plaintiff's complaint about HSA Liebel's telephone call to her to inquire about a lengthy phone call that she had been a party to, does not in any way implicate Title VII.  Plaintiff's telephone number had come up on DOC's "call list"

and as Liebel explained in his deposition, DOC generates a list of lengthy phone calls either from or to the prison facility which are investigated to find out if they are appropriate.  Those calls involving health services (CMHC) are sent to the Health Services Administrator (i.e., Liebel) to investigate to find out "if there were appropriate phone calls or let them know that we could not account for the phone call."  (Exhibit G, Liebel Depo., p. 28).  Plaintiff obviously did not like Liebel calling her about the fact that her phone number was on the "call list" of lengthy phone calls, however, there can be no dispute of fact that Liebel was conducting a work-related duty at Osborn.  Plaintiff's complaint that HSA Liebel called her on this issue does not even remotely implicate Title VII.  Hence, Liebel's telephone call to plaintiff about this matter cannot possibly be considered prohibited conduct under Title VII.

Given the foregoing regarding each of incidents raised in her incident report, none of the incidents rise to the level of protected activity under Title VII.  Each of the topics raised in the incident report concern a work-related communication with no content remotely implicating rights under Title VII or discriminatory actions by Ramonas or Liebel.  There is nothing in her complaint that discriminatory conduct "displaced standard business procedure."  *Kelly, supra.*

For the foregoing reasons, plaintiff's alleged protected conduct does not amount to "opposition" as the challenged actions by Ramonas and Liebel, were reasonable, appropriate, and objectively not unlawful.  Complaints to an employer "must be sufficiently specific to make it clear that the employee is complaining

about conduct prohibited by Title VII." *Bento v. City of Milford,* 2016 WL 5746340 at *9, *citing, Risco v. McHugh,* 868 F. Supp.2d 75, 110 (S.D.N.Y. 2012).  Further, plaintiff's incident report characterizes her complaint as "working in a hostile environment," which at best are "general allegations of harassment" and "not framed as involving discriminatory conduct."  *Ruhling v. Tribune Co.,* No. 04-cv-2430, 2007 WL 28283, at *21 (E.D.N.Y. 2007).

Notably, the UCHC Labor Relations Department, without evaluating plaintiff's April 22, 2014 complaint, forwarded plaintiff's to UCHC's Office of Institutional Equity ("OIE") which is statutorily responsible for investigating any complaints of discrimination.  (Exhibit D, Affidavit of EEO Specialist Robert Camilleri, ¶¶4, 5).  Upon receiving plaintiff's April 22, 2014 incident report, EEO Specialist Camilleri reached out to plaintiff to obtain further information including requesting that she complete a written form so he could gather further facts.  Plaintiff did not respond and never submitted the form.  Nevertheless, as required in his duties with OIE, Camilleri investigated plaintiff's claims set forth in her incident report and found no violations of UCHC/DOC's anti-discrimination policies. (*see*, SOF, ¶¶ 31-36).

For these reasons, plaintiff has failed to establish that she engaged in protected activity when she submitted her incident report on April 22, 2014.

.        **2. Plaintiff  Did Not Suffer An "Adverse Action"**

Furthermore, plaintiff has also failed to establish the third element of a prima facie case, i.e. that she suffered an "adverse action."  In order to state a prima facie case for retaliation under Title VII, plaintiff must establish that UCHC took adverse employment actions her.   However, employer conduct must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" in order to constitute an "adverse employment action." *Galabya v. N.Y.C. Bd. Of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000).   Plaintiff is required to show that a reasonable employee would have found the challenged action materially adverse, and that it would dissuade a reasonable worker from making or supporting a charge of discriminations." *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 67-68 (2006)("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").  Hence, "[a]n adverse employment action must be 'a materially significant disadvantage with respect to the terms of the plaintiff's employment.'" *Bento,* 2016 WL 5746340 at *9, *citing, Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir. 2004)(Judge Sonia M. Sotomoyer holding that plaintiff's subjective personal disappointment in not obtaining a transfer fails to meet the objective indicia to establish an adverse employment action).

Plaintiff claims that the adverse action she suffered was denial of "voluntary shift changes, the assignment of overtime work, and "termination" from employment.  (Complaint, ¶¶91, 92).  There are simply no facts to support any of

these claims.  Plaintiff can point to no denied shift changes or lost overtime assignments, which in any event even if occurred, would not rise to the level of a "materially significant disadvantage with respect to the terms of the plaintiff's employment."

Further, there is no evidence that plaintiff was "terminated." To the contrary, plaintiff unquestionably tendered her resignation on May 20, 2014 which was accepted by her supervisor Health Services Administrator Liebel on May 23, 2014. (*see*, SOF,  ¶¶37-47; Exhibits 8, 9, 10).   At no time did plaintiff dispute this or claim that she had not resigned.  Plaintiff did not seek to rescind her resignation. Further, when plaintiff later filed her union grievance on June 12, 2014, she did not appeal the grievance ruling by the State Office of Labor Relations which held that she had *not* been terminated, but rather had resigned her position.  By not appealing this decision, by the terms of the union CBA, she "assented" to this finding.  (*see*, SOF, ¶¶66, 67).

What is left is plaintiff's sole claim that the adverse action she suffered is that defendant denied her the opportunity to revert to a "per diem" LPN position after she had submitted her resignation as a durational LPN.  When plaintiff resigned her durational LPN position, defendant's Human Resources Officer Logan and HSA Liebel informed plaintiff that following her resignation as a durational LPN, if she desired to work as a per diem LPN, she would have to apply for any future per diem LPN positions. (SOF, ¶¶41, 42-44).  Plaintiff can point to no policy, procedure, or practice that informing her that she would have to apply for any per

diem position deviated from defendant UCHC's policies and practices regarding the hiring of per diem LPNs. *Bento,* 2016 WL 5746340 at *10, citing, Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 568 (2d Cir. 2011). Logan and Liebel informing plaintiff of the fact of UCHC's employment practices (i.e., that she would have to apply for any future per diem position) cannot be deemed an adverse action as she suffered no "materially significant disadvantage with respect to the terms of [her] employment." *Bento,* 2016 WL 5746340 at *9, *citing, Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir. 2004). Plaintiff had no right or entitlement to a per diem position after she had resigned her durational LPN position. As a durational employee, plaintiff was a "temporary" employee under the union collective bargaining agreement ("CBA") that covered the terms and conditions of her position. Under the CBA, temporary employees have no guaranteed employment beyond the termination point of the appointment. (SOF, ¶¶ 10, 11). Further, when plaintiff accepted the Durational LPN position, she signed an acknowledgement of the written "terms of durational appointments" which stated: "[a]s a durational employee, your position is anticipated to end on July 9, 2014…You cannot be guaranteed continued employment beyond the anticipated end date; therefore, termination is without right of appeal." (SOF, ¶ 9).

Thus, after plaintiff resigned her durational position with an end date of May 29, 2014, she had no right or entitlement to revert to a per diem position under the union CBA, the terms of her hire for her durational position, under state personnel regulations, or under UCHC personnel policies and practices. (SOF, ¶ 44). Further,

once plaintiff had accepted her durational LPN position on January 7, 2014, she had no status as a Per Diem nurse, **and,** once she submitted her resignation as a durational LPN which was effective May 29, 2014, **there was no Per Diem position for her to go back to.** (SOF, ¶¶46, 50).

Plaintiff has pointed to an LPN named Casey St. John as precedent for a durational LPN reverting to a per diem LPN.  However, the circumstances of plaintiff and St. John's employment history are not similar in any relevant manner. In St. John's circumstance, the Health Services Administrator had obtained approval to appoint St. John to a per diem position when her durational position ended early.  Moreover, her attendance record and performance were significant features that led to her being granted a per diem appointment as she was deemed a reliable employee.  Nevertheless, LPN St. John did not "revert" or go back to a per diem position after her durational appointment ended.  A position was authorized and then St. John was appointed to the per diem position.   (SOF, ¶¶47-49).

Furthermore, unlike St. John, plaintiff's poor attendance record during and at the end of her employment in which her resignation status was "not in good standing" would likely have  disqualified her from consideration as a per diem nurse. (SOF, ¶¶20, 48, 57, referring to affidavits from Human Resources Officer Logan and Principle Labor Relations Specialist Sylvia Santos-Flickinger).  It is factually incontestable, that in the short period of her employment as a durational LPN (January to May 2014), plaintiff had two counseling notices and one letter (designating her absences "sick leave abuse") regarding unauthorized leaves.  This

was followed by her 5 day absence during her resignation notice period which was an unauthorized leave as she failed to provide medical documentation as provided under the governing time and attendance DOC policy and led to her resignation being deemed "not in good standing." (SOF, ¶¶14-19, 52-60).  The plaintiff submitted a doctor's note at her grievance nearly a month later on June 18, 2014 ostensibly to justify her absences of May 24, 25, 26, 27, and 29, 2014.  However, this doctor's note was submitted long after required under DOC's attendance policy (the absence required medical documentation within 5 days of the absence)(*see,* Exhibit 23 [DOC Employee Handbook] and Exhibit 24 [DOC Administrative Directive 2.11- "Employee Dependability" p. 26, "Notification and Record Keeping").

Finally, plaintiff claimed in her deposition that her nursing supervisor Ramonas told her in a conversation that she could go back to a per diem position after her durational position ended.  However, assuming Ramonas made such statements, they flatly contradict all of the evidence in this case which shows: (1) there was no per diem position to go back to (*see,* SOF ¶52; Ex. A, Logan Affidavit,¶18) (2) when plaintiff accepted the durational position she lost any rights to a per diem position (SOF, ¶48), (3) pursuant to the union CBA she was a "temporary" employee with no rights to continued employment (SOF, ¶¶10, 11), (4) she had signed a written acknowledgment when she assumed the durational LPN position that there was no guarantee of future employment when her durational employment ended (SOF, ¶9), and (4) both Human Resources Officer Logan and

HSA Liebel informed plaintiff in writing that she would have to apply for a per diem position. (SOF, ¶¶ 42, 44).

Further, whatever Ramonas may have told plaintiff in oral discussions was never confirmed with either her Health Services Administrator Liebel, and most of all with Human Resources Officer Logan, both of whom plaintiff knew were responsible for employment matters. Ramonas also had no responsibility or role in the hiring of durational and per diem nurses. (Ex. F, Ramonas Depo., pp. 36-37).

The undisputed record therefore shows that plaintiff simply did not suffer an adverse action as she did not suffer from an "injury or harm." *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 67 (2006). Plaintiff's belief that she somehow had the right to "revert" to a per diem LPN position is without any basis in fact. Her subjective disappointment in not being able to go back to a per diem position does not constitute an adverse action as Title VII considers the "perspective of a *reasonable* employee" which is "an 'objective standard' of material adversity." *Dudley v. New York City Housing Authority,* No. 12 Civ. 2771 (PGG), 2014 WL 5003799, *28 (S.D.N.Y. 2014). A reasonable employee would not consider any of what happened to plaintiff as materially adverse, as a reasonable employee would know that nothing happened that constitutes an objective injury or harm as they had no right or entitlement to a per diem position. *Williams, supra.* As such, defendant informing her after she resigned that she would need to apply for a per diem position is objectively, not an adverse action.

Accordingly, plaintiff can offer no proof that she was disadvantaged with respect to the terms of her employment. *Bento v. City of Milford,* 2016 WL 5746340, at *9-10. As Human Resources Logan made crystal clear, plaintiff had no right or entitlement to a per diem LPN position after she resigned her durational position. Indeed, plaintiff acknowledged these terms of employment when she signed a formal "terms of durational employment" which stated in clear and unequivocal terms that "[y]ou cannot be guaranteed continued employment beyond the anticipated end date" of her durational position. (SOF ¶9; *see,* Exhibit 2, p. 2).

For the foregoing reasons, in addition to failing to establish that she engaged in protected conduct, plaintiff did not suffer an adverse action.

Accordingly, the Court can and should find that plaintiff has failed to establish a prima facie case of retaliation and on this basis alone, grant summary judgment.

## C.  Plaintiff Has Not Created A Triable Issue Of Fact As To Causation

### 1.  Plaintiff Cannot Raise A Triable Issue that UCHC's Desire To Retaliate Was the "But-For Cause" of its Actions

Under Title VII, the causation standard for retaliation complaints puts a more exacting standard of proof on a plaintiff. "A plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a "but-for cause of the alleged adverse action by the employer." *Nasser,* 133 S. Ct. at 2534; *Ya Chen Chen,* 805 F.3d at 70. Therefore, in the present case, plaintiff must prove that defendant's actions she challenges (i.e., not allowing her to revert to a per diem

position after she resigned her durational LPN position, rather, that she had to apply for a future per diem position) "would not have occurred absent a retaliatory motive" *Green v. Rochdale Village Social Services,* 2016 WL 4148322 at *8.  To establish this plaintiff must present evidence showing that defendant's proffered legitimate nonretaliatory reasons for its action are weak, implausible, inconsistent or contradicted.  *Zann Kwan v. Andalex Grp., LLC,* 7373 F.3d 834, 844 (2d Cir. 2013).

Plaintiff has failed to raise a triable issue of fact as to whether her alleged protected activities were the but-for cause of the employment actions for which she complains or that Defendant's non-retaliatory explanations are pretextual.

### 2. Plaintiff Cannot Show that UCHC's Explanation For Informing Her That She Would Have To Apply For Per Diem LPN positions Was Pretextual

As discussed in detail above, defendant UCHC's actions of informing plaintiff upon her resignation as a durational LPN that she would have to apply for a per diem position was objectively reasonable and constitute a legitimate non-discriminatory explanation notwithstanding plaintiff's mischaracterization of her resignation as a "termination."

Nevertheless, defendant's submissions establish a legitimate non-discriminatory explanation for the challenged action, namely that (1) plaintiff resigned from her only employment which was as a durational LPN, (2)  there was no per diem position for plaintiff to revert to, (3) once plaintiff had accepted the durational LPN position in January of 2014, she no longer had any status as a per

diem LPN, and (4) if she wanted a per diem position, she would have to apply for such position via the UCHC recruitment and hiring system.  (SOF ¶¶45, 46, 47, 51,58, 67, 68; *see, also,* Exhibit A, Logan Aff., ¶¶15, 16, 17).  Both Human Resources Officer Logan and Health Services Administrator Liebel clearly informed plaintiff of the basic fact of the UCHC recruitment and hiring system.  If plaintiff wanted to work as a per diem, she had to apply for posted positions on the UCHC Human Resources jobs website.  (SOF, ¶42, 44).

It is plaintiff's burden to show facts from which a reasonable jury could conclude that UCHC's explanation for informing her that she would have to apply for a per diem position is pretext for discrimination. "[Proving pretext] requires the plaintiff to produce 'not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the [defendant] were false, and that more likely than not discrimination was the real reason for the [adverse action]." *Underdog Trucking, L.L.C. v. Cellco P'ship,* 514 F. App'x 31, 33 (2d Cir.2013) (*quoting Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996)).

Even if Plaintiff has successfully established a prima facie case of discriminatory retaliation, her claim would still fail because she cannot rebut the legitimate, non-discriminatory reasons for informing plaintiff that she would have to apply for a future per diem LPN position after she resigned as a durational LPN. *Abdu–Brisson v. Delta Air Lines,* 239 F.3d 456, 466 (2d Cir. 2001).  The evidence

shows that there are no weaknesses, implausibilities, inconsistencies, or contradictions in this evidence.

Moreover, as discussed above, plaintiff cannot establish that LPN Casey St. John – the only alleged comparator – was similarly situated to her in all respects. *Chen,* 805 F.3d at 73. St. John had been a per diem LPN in March of 2012 and later was appointed as a durational LPN on June 1, 2012 with an appointment to extend to May 31, 2013. However, her durational position ended early on February 21, 2013. The Health Services Administrator in another prison contacted the CMHC Central office and requested approval to establish a per diem position which was approved. St. John was awarded the position based on a review of St. John's excellent performance and attendance record. (SOF ¶49; Exhibit Logan Aff. ¶19, Exhibit G, Liebel Depo, pp. 20-21, 50-51).

Plaintiff's circumstances are not comparable to St. John's. In contrast to St. John, plaintiff's poor attendance would likely have disqualified her as a per diem candidate had she applied. *See, Ya Ya Chen,* (plaintiff presented no evidence of comparable Professors charged with inappropriate conduct with a student or lack of collegiality). Plaintiff is simply unable to present any evidence that similarly situated durational LPNs with poor attendance records were permitted to revert to a per diem LPN position. On this metric alone, St. John (or any other temporary/durational LPN that plaintiff may allege) is not comparable to the plaintiff.

Thus, even if UCHC/CMHC had established a per diem position at the time plaintiff resigned in May of 2014, plaintiff essentially disqualified herself given this record of unauthorized absences. *See Rosario v. Hilton Hotels Corp.*, 476 F. App'x 900, 903 (2d Cir.2012) (summary order) (finding that the plaintiff and other employees were not similarly situated because of the plaintiff's disciplinary history); *McKinney v. Bennet*, No. 06 Civ. 13486, 2009 WL 2981922. at *7 (S.D.N.Y. Sept. 16, 2009) (finding the same); *Howell v. Montefiore Med. Ctr.*, No. 13 CIV. 8505 (AT), 2016 WL 880373, at *7 (S.D.N.Y. 2016). *Henderson v. Sikorsky Aircraft Corp., Inc.*, 590 Fed.Appx. 9 (2d Cir. 2014)(summary order)(plaintiff failed to produce evidence to rebut the employer's legitimate explanation for denying him a raise; plaintiff offered no evidence "suggesting that Sikorsky's explanation is a camouflage for more insidious motives," relying on his "beliefs" insufficient).

Given the foregoing, plaintiff cannot establish any triable fact that defendant's conduct was a pretext for a retaliatory motive.

### 3. **Plaintiff Cannot Rely On Temporal Proximity To Prove Pretext**

Additionally, assuming plaintiff points to the temporal proximity of her incident report on April 22, 2014 and being informed that she would have to apply for a per diem LPN position after she had resigned on May 20, 2014 as evidence of pretext, this is plainly insufficient to raise a triable issue of fact as to pretext. *Grasso v EMA Design Automation, Inc.,* 2014 WL 4955303 (W.D.N.Y. 2014) *citing El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir. 2010 ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of

establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."); *Green v. Rochdale Village Social Services, Ind., et. al.,* 15 Civ. 5824 (BMC), 2016 WL 4148322 (E.D.N.Y. 2016)(plaintiff failed to show that defendant retaliated against her based on her complaints as her termination was due to her continued poor performance of her most basic job duties). Thus, plaintiff cannot point to any evidence that UCHC retaliated against her based on her April 22, 2014 incident report.

It is well established that "temporal proximity alone is insufficient to defeat summary judgment at the pretext stage. *Kwan,* 737 F.3d at 847. "'Although plaintiff may rely on evidence comprising [her] *prima facie* case, including temporal proximity,' it must be provided 'together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Green,* 2016 WL 4148322 at *8; *see, also, El Sayed v. Hilton Hotels Corp.,* supra; *Grasso v EMA Design Automation, Inc.,* 618 Fed. Appx. 36 (2d Cir. 2015)(summary order) (the mere fact that elimination of plaintiff's position was close in time to her filing a discrimination complaint did not raise a triable issue of fact as to pretext); *Fanelli v. The State of New York,* 13-CV-6627 (DRH)(AKT), 2016 WL 4076539, *9 (E.D.N.Y. 2016)(temporal proximity between protected activity and adverse action is not sufficient evidence to prove pretext).

The evidence is clear that after plaintiff had submitted her incident report on April 22, 2014, she submitted her resignation on May 20, 2014 from the only

position she had with CMHC, namely her durational LPN position.  Defendant

UCHC accepted her resignation.  As discussed above, UCHC informing plaintiff

that she would have to apply for any future per diem positions was truthful.  Hence,

there is no evidence that defendant's actions were pretextual, false, or a camouflage

for retaliation.

　　　　Moreover, plaintiff's apparent insistence of her right to revert to a per diem

position flies in the face of UCHC's articulated Human Resource practices that were

consistent with the objective proof of plaintiff's conditions of employment reflected

in her hire letter, acceptance of the "terms of durational employment," and the

union CBA.

　　　　Under these circumstances, plaintiff's claim would effectively have the Court

substitute its judgment as to defendant's personnel management practices in the

area of recruitment and hiring that, in this case, have been shown to be legitimate,

reasonable, and properly administered.  *See, Ya-Chen v. City University of New*

*York,* 805 F.3d at 73-74 ("Title VII is not an invitation for courts to 'sit as a super-

personnel department that reexamines' employer's judgments.", *citing, Delaney v.*

*Bank of Am. Corp.,* 766 F.3d 163, 169 (2d Cir. 2014)(per curiam)). *See also Ahmed v.*

*Johnson,* 752 F.3d 490, 401 (1st Cir. 2014) ("We have repeatedly recognized that it

is not our place to second-guess an employer's legitimate business decisions ....");

*Risco v. McHugh*, 868 F. Supp. 2d 75, 105 (S.D.N.Y. 2012) ("[i]t is not the job of the

Court to question the employer's means to achieve a legitimate goal.").

Accordingly, plaintiff is unable to offer any evidence of pretext for UCHC informing her that he would have to apply for a per diem LPN position after she resigned from her durational LPN position.

## III.   CONCLUSION

Plaintiff's retaliation complaint should be dismissed as plaintiff cannot establish a prima facie case of retaliation.  Assuming plaintiff could establish a prima facie case, plaintiff cannot establish any facts to show that defendant's legitimate nondiscriminatory reasons for actions were a pretext for retaliation.

For the foregoing reasons, the defendant respectfully moves that this Court grant its Motion for Summary Judgment in its entirety.

DEFENDANT
UNIVERSITY OF CONNECTICUT
HEALTH CENTER


GEORGE JEPSEN
ATTORNEY GENERAL


By:    /s/ Stephen J. Courtney
Stephen J. Courtney
Assistant Attorney General
Employment Rights Department
55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Tel:  (860) 808-5340
Fax.: (860) 808-5383
Federal Bar No. ct11650
Email:  Stephen.Courtney@ct.gov

## CERTIFICATION

I hereby certify that on November 17, 2016 a copy of the foregoing

Defendant's Memorandum of Law In Support of Motion for Summary Judgment

was filed electronically.  Notice of this filing was sent by e-mail to all parties by

operation of the Court's electronic filing system.  Parties may access this filing

through the Court's system.

/s/ Stephen J. Courtney
Stephen J. Courtney (#ct11650)
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Tel.: (860) 808-5340
Fax: (860) 808-5383
E-mail: Stephen.Courtney@ct.gov