# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHAWNEE O'DONNELL,            :      CIVIL CASE NO.
          Plaintiff,              :       3:15-cv-01191 (AWT)
                                        :
VS.                                   :
                                        :
UNIVERSITY OF CONNECTICUT        :
HEALTH CENTER,                     :
          Defendant.             :      JANUARY 23, 2017

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.      *Background*

The defendant is a health institution which provides, among other programs, health services to the inmates residing within the correctional institutions of the State of Connecticut. The plaintiff, whose gender is female, is a licensed practical nurse, whom the defendant hired on October 4, 2013, to work as a per diem nurse assigned to Osborne Correctional Institution. *Plaintiff's Complaint ¶ 15; Defendant's Answer ¶ 15.* The plaintiff worked on the average twenty-four to thirty-two hours per week as a per diem nurse assigned to Osborne Correctional Institution. *Plaintiff's Complaint ¶ 16; Defendant's Answer ¶ 16.* On January 10, 2014, the defendant offered the plaintiff a durational assignment, which she accepted once she was assured by her supervisor, Rob Ramonas ("Ramonas") her supervisor, that upon the conclusion of the durational assignment, she would automatically revert to her per diem employment status without a break in her employment. *O'Donnell Tr. 30:25-31:10; 32:11-34:13; 64:20-65:2; 72:3-25; 85:17-89:8; Ramonas Tr. 19:21-20:6; Liebel Tr. 20:15-20.*

After the plaintiff commenced her durational assignment, Ramonas would instruct the plaintiff to report to his office for reasons unrelated to her employment and job duties. When the

plaintiff inquired of Ramonas as to the reason he required her to report to his office, Ramonas would respond, "I just needed to look at you." *O'Donnell Tr. 43:14-44:1; 52:2-53:14; 89:24-92:3; 130:5-12.* Ramonas would instruct the plaintiff to report to his office on a daily basis without a legitimate reason, solely to physically observe her. *O'Donnell Tr. 43:14-44:1; 52:2-53:14; 89:24-92:3; 130:5-12.* In February of 2014, Ramonas made extremely inappropriate comments to the plaintiff regarding the clothes which the plaintiff had worn to work. *O'Donnell Tr. 43:14-49:16; 92:4-94:5; 124:19-126:4.* In February of 2014, Ramonas called the plaintiff to his office and informed her that a ranking corrections officer of the Department of Corrections had concerns about the plaintiff wearing jeans on her assignments. *O'Donnell Tr. 43:14-49:16; 93:17-94:5; 124:19-126:4.* The wearing of jeans did not violate any policy of the defendant. *O'Donnell Tr. 43:14-49:16; 93:17-94:5; 124:19-126:4.* After the plaintiff objected to Ramonas' comments, pointing out that most of the other nurses wore jeans as well, Ramonas replied "look at you Shawnee, and look at them." *O'Donnell Tr. 43:14-49:16; 93:17-94:5; 124:19-126:4.* When the plaintiff questioned Ramonas as to the meaning of his statement, Ramonas replied, "you are too pretty to wear jeans here and your body is too nice." *O'Donnell Tr. 43:14-49:16; 93:17-94:5; 124:19-126:4.* Having[1] no issue with the concerns of the Department of Corrections, the plaintiff strongly objected to the sexually degrading manner in which Ramonas conveyed these concerns to her. The plaintiff informed Ramonas that his comments were sexually degrading, discriminatory, and unprofessional. *O'Donnell Tr. 43:14-49:16; 93:17-94:5; 124:19-126:4.* On a day that the plaintiff was wearing "scrubs," Ramonas offensively told the plaintiff, "do not let them get any looser, or I'll have nothing to look at." *O'Donnell Tr. 94:9-12.*

---

[1] The plaintiff never violated the dress policy of the Department of Corrections; she never wore clothing that revealed or abnormally accentuated her body. In fact, prior to April of 2014, although the plaintiff had been working the durational assignment since January of 2014, she had never been counseled by Ramonas about the clothing she wore to work. *Ramonas Tr. 23:16-19; O'Donnell Tr. 45:16-21; 124:19-126:4.*

On March 31, 2014, the plaintiff came down ill, and reported to the defendant that she would not be coming to work. *O'Donnell Tr. 39:12-40:23; 94:16-95:23; 126:6-127:21.* On April 1, 2014, the plaintiff, still feeling ill, was examined by her physician who placed her on medical leave until April 4, 2014.  *O'Donnell Tr. 39:12-40:23; 94:16-95:23; 126:6-127:21.* Approximately one week after returning to work, the plaintiff was issued a written warning for being out of work too many days. *O'Donnell Tr. 39:12-40:23; 94:16-95:23; 126:6-127:21.*  A counseling meeting was scheduled between the plaintiff and Ramonas. *O'Donnell Tr. 39:12-40:23; 94:16-95:23; 126:6-127:21.*  During the counseling session, Ramonas told the plaintiff, "I will fight for you, if it's worth it." *O'Donnell Tr. 96:11-98:19; 123:5-18.*  When the plaintiff inquired as to the meaning of his statement, Ramonas replied, "I think you know what I mean." *O'Donnell Tr. 96:11-98:19; 123:5-18.*  Because of the overt sexual connotation of Ramonas' comment, the plaintiff filed a written complaint with the Department of Corrections about Ramonas' sexually harassing behavior. *O'Donnell Tr. 42:22-43:2; 49:10-53:11.* The Department of Corrections turned the complaint over to Brian Liebel ("Liebel"), who was the defendant's health service administrator assigned to Osborne Correctional Institution. *O'Donnell Tr. 51:7-16; 99:1-13.*  Immediately after the complaint was received by Liebel, the plaintiff was subjected to retaliation. *O'Donnell Tr. 99:14-103:1.*  The plaintiff's requests to shift work posts were unreasonably denied, when previously her requests had been granted so long as the other nurse, in the same classification, agreed to the switch. *O'Donnell Tr. 60:16-62:25; 99:14-100:5.* The plaintiff was denied overtime, when prior to her complaint, she was allowed on many occasions to work overtime assignments. *O'Donnell Tr. 100:6-103:1.*  On May 20, 2014, the plaintiff inquired of the defendant's human resources director, Noreen Logan ("Logan"), if she could end the durational assignment early. *O'Donnell Tr. 103:5-104:4.* Logan

informed the plaintiff that she would have to provide the defendant with a two-week working notice that she was ending her durational assignment. *O'Donnell Tr. 103:5-104:4.* On May 23, 2014, Liebel, after receiving a notice from the plaintiff that she would be resigning from her durational assignment and returning to her per diem position, emailed the plaintiff informing her that her request to end her durational assignment had been accepted, but that her request to return to her employment as a per diem status had been denied, and that she would have to reapply for the position. *O'Donnell Tr. 104:5-10-106:11; 121:7-122:9.* The established practice of the defendant was to return per diem nurses, who had accepted durational assignments, to their per diem status on the conclusion of their durational assignments. *O'Donnell Tr. 30:25-31:10; 32:11-34:13; 64:20-65:2; 72:3-25; 85:17-89:8; Ramonas Tr. 19:21-20:6; Liebel Tr. 20:15-20; Defendant's Exhibit 22.* The defendant's human resources officer, Noreen Logan in an email to Sylvia Santos-Flickinger, the defendant's principal labor relations specialist, on May 30, 2014, makes no mention of a requirement that an employee would have to reapply for the per diem position at the completion of a durational assignment to revert back to his or her former employment as a per diem employee. The reapplication requirement was a condition made up by Brian Liebel, the defendant's health services administrator assigned to Osborne Correctional Institution, to retaliate against the plaintiff because she had complained about the sexual harassment to which had been subjected. Liebel's actions resulted in the termination of the plaintiff's employment by the defendant for the sole reason that she had opposed the sexual harassment to which she was subjected by Ramonas. *O'Donnell Tr. 104:5-10-106:11; 121:7-122:9.* The defendant terminated the plaintiff's employment in retaliation against the plaintiff for opposing unlawful gender discrimination and sexual harassment to which the plaintiff had been subjected by Ramonas. *O'Donnell Tr. 104:5-10-106:11; 121:7-122:9; Defendant's Exhibit 11.*

Designating the plaintiff's resignation from her durational assignment as "not in good standing," made it futile for the plaintiff to reapply for her per diem nursing position. *O'Donnell Tr. 81:19 -83:17; Defendant's Exhibit 20.* Section 5-243-1 of the Regulations of Connecticut State Agencies, mandate that "[w]hen a resignation is reported as not in good standing, the appointing authority shall so notify the employee and shall also advise the employee of his right to file an appeal to the Commissioner of Administrative Services." Defendant's *Exhibit 20.* The defendant ignored the explicit requirements of Section 5-243-1 of the Regulations of Connecticut State Agencies, when Logan failed to inform the plaintiff of her right to file an appeal from Logan's designating the plaintiff's resignation as "not in good standing." *Defendant's Exhibit 12.* The defendant's reasons for designating the plaintiff's resignation from her durational assignment as "not in good standing," are patently false. *O'Donnell Tr. 73:14-79:5; 128:20-130:4.* The designation of the plaintiff's absence on May 29, 2014, as a no-call, no-show, when she was in the hospital because she had miscarried, as the defendant was fully aware, is a clear demonstration of the retaliatory behavior directed at the plaintiff by the defendant. *O'Donnell Tr. 73:14-79:5; 128:20-130:4,* and the pretext for not allowing the plaintiff to return to her per diem position. The defendant cannot point to any policy or procedure that requires an employee, who had already been employed by the defendant in a per diem nursing position, and accepted a durational assignment, would be required to reapply for the per diem position to retain the employee's state employment upon the expiration of the employee's durational assignment. The testimony of Ramonas, and Liebel are to the contrary, as are the written communications between Logan and Santos-Flickinger. *O'Donnell Tr. 30:25-31:10; 32:11-34:13; 64:20-65:2; 72:3-25; 85:17-89:8; Ramonas Tr. 19:21-20:6; Liebel Tr. 20:15-20; Defendant's Exhibit 22.* The reapplication requirement as applied to the plaintiff was a condition made up by Liebel in

retaliation for the plaintiff complaining about the sexual harassment to which she had been subjected.  *O'Donnell Tr. 30:25-31:10; 32:11-34:13; 64:20-65:2; 72:3-25; 85:17-89:8; Ramonas Tr. 19:21-20:6; Liebel Tr. 20:15-20; Defendant's Exhibit 9; Defendant's Exhibit 11; Defendant's Exhibit 22.*  The established practice of the defendant was to return per diem nurses, who had accepted durational assignments, to their per diem status on the conclusion of their durational assignments.  *O'Donnell Tr. 30:25-31:10; 32:11-34:13; 64:20-65:2; 72:3-25; 85:17-89:8; Ramonas Tr. 19:21-20:6; Liebel Tr. 20:15-20; Defendant's Exhibit 22.*  The defendant's human resources officer, Noreen Logan in an email to Sylvia Santos-Flickinger, the defendant's principal labor relations specialist, on May 30, 2014, makes no mention of a requirement that an employee would have to reapply for the per diem position at the completion of a durational assignment to revert back to his or her former employment as a per diem employee.  The reapplication requirement was a condition made up by Brian Liebel, the defendant's health services administrator assigned to Osborne Correctional Institution, because the plaintiff had complained about the sexual harassment to which she had been subjected.

The assertion of the defendant that the plaintiff had work attendance issues are untrue.  The initial counseling sessions were a sham in that Liebel never informed the plaintiff the procedure to follow when sick without accrued sick time.  The employee would simply have to request that the time out be designated authorized leave without pay.  Contrary to the defendant's skewed rendition of the facts surrounding the plaintiff's absences from work, the plaintiff was not a sick time abuser.  The plaintiff had commenced her durational assignment on January 10, 2014.  Since she was a per diem nurse, she had no accrued sick time.  Therefore, any time off because of sickness could potentially result in a charge of abuse of sick time if not properly categorized as authorized leave without pay.  Since the counseling memos issued the plaintiff by Liebel

never advised the plaintiff of the procedure to follow to have her sick days characterized properly as authorized leave without pay, as he was required to do, the plaintiff received a counseling memorandum on February 19, 2014, again without properly advising the plaintiff of the proper procedure to have her days correctly listed as authorized leave, the plaintiff was unfairly issued a disciplinary warning by Liebel because she had two counseling memos[2], the very individual who failed in his responsibility to properly counsel the plaintiff.  Never once did Liebel inform the plaintiff that she could request that her sick time be categorized as authorized absences without pay.  It is a misrepresentation to contend that "Liebel was affording the plaintiff an additional opportunity to complete her durational assignment, and that the plaintiff's absences were an abuse of sick time.  The only reason that the defendant could assert that the plaintiff's absences were an abuse of sick time was due to its own failure to counsel the plaintiff on the proper procedure to designate sick time as authorized leave with pay.  *Defendant's Exhibit 24, DOC, Administrative Directive, 2.11, Section 10.*

II.   *Discussion*

A. *Legal Standard*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  *Cronin v. Aetna Life Insurance Co.,* 46 F.3d 196, 202 (2d Cir.1995)*; Chambers v. TRM Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994).  "It is of course well established that a motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter

---

[2] The plaintiff disputes receiving the February 3, 2014, memorandum.  In comparison to the February 19, 2014, memorandum, the plaintiff's signature is nowhere to be found on the February 3, 2014, memorandum.

of law.  See Fed.R.Civ.P. 56(c).  "Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Holcomb v. Iona College,* 521 F.3d 130, 137 (2d Cir.2008).  In assessing the record to determine whether there is such an issue, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Stern v. Trustees of Columbia University in City of New York,* 131 F.3d 305 (2d Cir.1997).  "The party moving for summary judgment is initially responsible for demonstrating the absence of a genuine issue of material fact…Then the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim.  The non-moving party is required to go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial…But in assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Holcomb v. Iona College,* 521 F.3d at 137 (Internal citations and quotations omitted).  In deciding a motion for summary judgment, the court cannot try issues of fact, but can only determine whether there are issues of fact to be tried.  *Kerzer v. Kingley Mfg.*, 156 F.3d 396, 400 (2d Cir.1998) If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference can be drawn in favor of the non-moving party, summary judgment is improper.  *Chambers v. TRM Copy Centers Corp.*, 43 F.3d at 37; *Lafond v. General Physics Services Corp.,* 50 F.3d 165, 171 (2d Cir.1995).  The trial court's function at this stage is to identify issues to be tried, not decide them.  *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000).

In an employment discrimination case where intent of the employer is at issue, the trial court must be especially cautious about granting summary judgment. *Kerzer v. Kingley Mfg.,* 156 F.2d. at 400. Summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error. *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 54 (2d Cir.1998). "Summary judgment is sparingly used where intent and state of mind are at issue...because, as we have emphasized, careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination..." *Graham v. Long Island R.R.,* 230 F.3d at 38. "We have repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case, where, as here, the merits turn on a dispute as to the employer's intent…Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Holcomb v. Iona College,* 521 F.3d at 137 (Internal citations and quotations omitted). "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party…Consistent with this standard, all evidence favorable to the nonmoving party must be credited if a reasonable jury could credit it. Evidence favorable to the moving party, on the other hand, must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached…When reasonable persons, applying the proper legal standards, could differ in their responses to the question raised on the basis of the evidence

presented, the question must be left to the jury." *Lyddy v. Bridgeport Bd. of Educ.,* 2010 U.S.
Dist. LEXIS 120820 (D. Conn. Nov. 15, 2010) (Internal citations and quotations omitted).

    B.  *Unlawful Retaliation*

        1.  *Prima Facie Case of Retaliation*

"To establish a prima facie case of retaliation under Title VII, a plaintiff is required to show
that: (1) she participated in a protected activity known to the defendant; (2) she experienced an
adverse employment action; and (3) a causal connection exists between the protected activity and
the adverse employment action. See Terry[3], 336 F.3d at 141.  Once a plaintiff makes out a prima
facie case of retaliation, the burden shifts to the defendant to articulate a legitimate,
nonretaliatory reason for the alleged retaliatory acts, at which point the burden shifts back to the
plaintiff to show circumstances that would be 'sufficient to permit a rational factfinder to
conclude that the employer's explanation is merely a pretext for impermissible retaliation.' *Cifra
v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir.2001)."  *John v. Kingsbrook Jewish Med. Ctr.,* 598
F. App'x 798, 799 (2d Cir. 2015).  As to the first element of the plaintiff's prima facie case, it
cannot be disputed that the incident report, *Defendant's Exhibit 7,* submitted by the plaintiff to
the Department of Corrections constituted protected activity under Title VII of the Civil Rights
Act of 1964, as amended.  The defendant's principal labor relations specialist clearly viewed the
incident report as constituting a sexual harassment complaint when she forwarded the complaint
to Robert Camilleri, the defendant's EEO officer, for his review.  *Defendant's Exhibit 15.*
Undoubtedly, the incident report submitted by the plaintiff constituted protected activity in that it
signified the plaintiff's opposition to sexual harassment in the workplace[4].  Regarding the second

---

[3] *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir.2003).
[4] It cannot seriously be claimed that a trier of fact would not be able to determine that the plaintiff had a good
faith belief that Ramonas' behavior constituted sexual harassment.  "Protected activity for purposes of Title VII
…retaliation claims encompasses an employee's complaint to supervisors about alleged unlawful activity, even

element, the actions to which the plaintiff asserts she was subjected, after voicing her opposition to the sexual harassment to which she was subjected, sufficiently establish that the defendant subjected the plaintiff to adverse employment actions as that phrase has been interpreted by the United States Supreme Court for purposes of proving a claim of unlawful retaliation.  "To constitute an adverse employment action for purposes of a retaliation claim, the action must be 'materially adverse' such that it could 'dissuade a reasonable worker from making or supporting a charge of discrimination.' *Burlington N. & Santa Fe R.R. Co. v. White,* 548 U.S. 53, 57 (2006) (internal quotation marks omitted). The alleged retaliatory behavior 'need[s] to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable.' *Hicks v. Baines,* 593 F.3d 159, 165 (2d Cir.2010) (citation omitted); *see also Tepperwien v. Entergy Nuclear Operations,* 663 F.3d 556, 568 (2d Cir.2011) (citing *Hicks,* 593 F.3d at 165) ('Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct.')."  *Giordano-Forkan v. New York City Dep't of Educ.,* No. 13 CIV. 06950 GBD, 2014 WL 5369426, at *2 (S.D.N.Y. Oct. 17, 2014).  The defendant's treatment of the plaintiff since she opposed the sexual harassment directed at her constitute adverse actions, in that the actions taken against the plaintiff by the defendant would most certainly dissuade a reasonable worker from making or supporting a charge of

---

if the activity turned out not to be unlawful, provided that the employee 'had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII.' *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir.2001). 'The objective reasonableness of a complaint is to be evaluated from the perspective of a reasonable similarly situated person.' *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 17 (2d Cir.2013)."  *Rodas v. Town of Farmington,* 567 F. App'x 24, 26 (2d Cir. 2014). Viewing the plaintiff's allegations in a light most favorable to her, Ramonas' frequent comments concerning the plaintiff's physical traits could reasonably be seen as sexually harassing conduct.  The plaintiff does not question that it was permissible for Ramonas to advise the plaintiff of the concerns the Department of Corrections had with her wearing jeans, even though they were not justifiable, but it was clearly impermissible for Ramonas to address the plaintiff in the sexually degrading manner in which he did.

discrimination.  "Title VII provides that '[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' 42 U.S.C. § 2000e–3(a). Thus, for a retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice. *Id.*  The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.' *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64, 126 S.Ct. 2405. As the Court cautioned: Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about

12

discrimination. *Id.* at 69, 126 S.Ct. 2405 (citations omitted) (internal quotation marks omitted); *see also Kessler v. Westchester Cty. Dep't of Soc. Servs.,* 461 F.3d 199, 207–09 (2d Cir.2006) (quoting *White,* 548 U.S. at 62–71, 126 S.Ct. 2405)." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 89-91 (2d Cir. 2015). Although the defendant attempts to trivialize the degradation of the plaintiff, "context matters," and "…even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable.' *Hicks v. Baines,* 593 F.3d 159, 165 (2d Cir.2010)." *Giordano-Forkan v. New York City Dep't of Educ.,* No. 13 CIV. 06950 GBD, 2014 WL 5369426, at *2 (S.D.N.Y. Oct. 17, 2014). Immediately on the heels of her voicing opposition to the sexually harassing manner in which she had been treated by Ramonas, the plaintiff was denied overtime opportunities which she had consistently been provided even after accepting the durational assignment. In addition, Ramonas, flouting past practice, would no longer allow the plaintiff to switch shifts with other agreeable nurses. Ramonas only reversed himself after being criticized by a union steward, Amy Felt. Most seriously, the defendant refused to allow the plaintiff to revert to her per diem nursing position after she resigned from her durational assignment. The excuse fostered by the defendant that the plaintiff did not reapply for the position ignores the realities, that by classifying the plaintiff's resignation as not in good standing, the defendant had effectively terminated the plaintiff's employment. Additionally, Ramonas, Liebel, and Logan conceded, consistent with Ramonas' assurances to the plaintiff when the plaintiff was considering the durational assignment, that other nurses were allowed, without reapplying, to resume their previous per diem employment on the expiration of their durational assignments. "[D]efendant argues that plaintiff did not suffer an adverse employment action because of his disability as he did not apply for a teaching position for the 2007–2008 academic year. The Second Circuit has clearly held that where an employee seeks renewal of the

employment contract, non-renewal of the contract constitutes an adverse employment action. *Leibowitz v. Cornell University*, 584 F.3d 487, 501 (2d Cir. 2009).  Defendant contends that since plaintiff didn't re-apply for the per diem teaching position, he didn't seek renewal of the contract; therefore, in this case, the non-renewal was not an adverse employment action. In *Leibowitz*, the Court went on to state: 'Although the parties focus on the terminology used with respect to the plaintiff, whether plaintiff was 'laid off' or 'terminated,' or her employment was 'not renewed' is not critical to the legal analysis; rather, she suffered an adverse employment action because she was denied the requested continued employment, regardless of the label.' *Id.* Here, it is undisputed that plaintiff was denied requested continued employment in the general sense.  It was clear from the meeting between plaintiff and Mr. Ortiz at the conclusion of the 2006–2007 academic year that plaintiff expressed his desire to remain employed for the 2007–2008 school year, but Mr. Ortiz informed plaintiff that only daytime staff would be receiving recommendations for Central at Night positions. Drawing all inferences in favor of plaintiff, where, as here, an employer, with knowledge that its employee wants to continue his employment, essentially tells its employee, 'Don't bother applying'-for stated reasons that appear facially false-it may constitute denial of requested employment. This is especially true where the Second Circuit has advised that labels are not important.  *Id.*"  *Moran v. Bd. of Educ. of City of Bridgeport*, No. 3:10-CV-00393-WWE, 2013 WL 1294584, at *4 (D. Conn. Mar. 28, 2013).

The denial of overtime opportunities to the plaintiff, and the refusal to allow the plaintiff to return to her per diem assignment most certainly amount, individually, and in the aggregate to materially adverse employment actions to support an unlawful retaliation cause of action. "*Burlington Northern* expanded the definition of 'materially adverse employment action' for purposes of Title VII retaliation claims.  Now, a Title VII plaintiff 'must show that a reasonable

employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' 548 U.S. at 68, 126 S.Ct. 2405 (internal quotation marks omitted).  The Court rejected the proposition that an actionable act of retaliation must relate to the specific terms and conditions of the employee's employment, *id.* at 61, 126 S.Ct. 2405, and construed 'materially adverse action' broadly to include changes in employment life outside of the terms and conditions of employment. *Id.* The Court concluded that only this broader definition fulfilled the purpose of Title VII's anti-retaliation provision: preventing employers from deterring their employees from exercising their legitimate legal rights. *Id.* at 68, 126 S.Ct. 2405." *Millea v. Metro-N. R. Co*., 658 F.3d 154, 164 (2d Cir. 2011).

The temporal proximity between the plaintiff's protected activity and the adverse actions imposed to which the plaintiff was subjected is sufficient to satisfy the third element of a prima facie case of retaliation.  Although temporal proximity alone cannot establish pretext, it most certainly has been uniformly found by the federal courts at all levels to be sufficient for purposes of proving the causation prong of a prima facie case of retaliation.  See *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254-55 (2d Cir. 2014); *Marini v. Costco Wholesale Corp.,* No. 3:11-CV-00331 JAM, 2014 WL 6772287, at *12 (D. Conn. Dec. 1, 2014) *reconsideration denied*, No. 3:11-CV-00331 JAM, 2015 WL 1169284 (D. Conn. Mar. 13, 2015); and *White v. City of Middletown*, 45 F. Supp.3d 195, 218-19 (D. Conn. 2014).  The negative treatment of the plaintiff only occurred after the plaintiff voiced opposition to the harassment to which she was being subjected."The Second Circuit has taught that '[p]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment ...; or (2) directly, through evidence of retaliatory animus directed against the plaintiff

by the defendant.' *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000)…"
*Ayantola v. Cmty. Tech. Colleges Of CT Bd Of Trustees*, No. 3:05 CV 957 MRK, 2007 WL
963178, at *3 (D. Conn. Mar. 30, 2007) (Emphasis added).  As explained by the court in *White v.
City of Middletown,* 45 F. Supp. 3d at  218-19, "Courts have 'not drawn a bright line to define
the outer limits beyond which a temporal relationship is too attenuated to establish a causal
relationship between the exercise of a federal constitutional right and an allegedly retaliatory
action.' *Gorman–Bakos,* 252 F.3d at 554. Thus, a court may 'exercise its judgment about the
permissible inferences that can be drawn from temporal proximity in the cases.' *Espinal v.
Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Hollander v. American Cyanamid Co.,* 895 F.2d
80, 85–86 (2d Cir.1990) (three months between EEOC complaint and adverse conduct too
attenuated to create causal connection)) and *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45–46
(2d Cir.1980) (lapse of eight months between EEOC complaint and retaliatory act was sufficient
to establish causal connection).  *Where there are longer gaps in time between protected activity
and adverse employment action, the inference of causation may be inferred from the fact that the
employer was waiting for the opportune time to retaliate. See Espinal v. Goord,* 558 F.3d at 130
(finding lapse of six months sufficient to support an inference of causal connection based partly
on fact that officers were waiting for opportune time to retaliate); *Grant v. Bethlehem Steel
Corp.,* 622 F.2d at 45–46 (affirming finding that eight month gap between EEOC complaint and
retaliatory action suggested causal relationship because it was the first opportunity for
retaliation))." (Emphasis added).  The plaintiff filed a complaint of sexual harassment on April
22, 2014.  Approximately one month later, her employment with the defendant was effectively
terminated.  Further, immediately after filing the incident report, the defendant no longer allowed
the plaintiff any overtime opportunities, as well as attempting to deprive her of the ability to

change shifts on occasion.   The temporal proximity between the plaintiff's complaint, and the acts of retaliation directed at the plaintiff satisfies the final element of the plaintiff's prima facie case.

> 2.  *Pretext – Plaintiff's Absenteeism*

The defendant attempts through a gross distortion of its own policies to depict the plaintiff as a habitual violator of its employee dependability policy.  However, the defendant misstates the facts surrounding the plaintiff's use of sick time.  The first counseling letter, which was unsigned, and which the plaintiff denied ever receiving, erroneously asserts that the plaintiff failed to follow proper reporting procedures; in a misrepresentation of the "Employee Dependability Policy," the plaintiff was being counseled for being sick, not for failing to follow proper procedure.  The plaintiff fully complied with the employee dependability policy by calling in sick prior to the commencement of her shift.  *O'Donnell Tr. 35:19-40:23.*

Liebel proceeded to issue the plaintiff a second unwarranted counseling letter on February 19, 2014, for an absence on February 13, 2014.  The plaintiff denies that her absences due to illness violated any policy of the defendant or the department of corrections regarding sick time. The plaintiff commenced her assignment on January 10, 2014.  Pursuant to collective bargaining agreement, the plaintiff would not have accrued any sick time until one month following the commencement of her durational assignment on January 10, 2014.  *Defendant's Exhibit 19 at p. 62.*  Under the terms of the collective bargaining agreement, sick leave was earned at the "rate of eight and three-quarters (8.75) hours for each calendar month of employment."  As of February 3, 2014, when the defendant claims the plaintiff violated the Employee Dependability Policy, by "calling out sick without sufficient sick accruals to cover the absence," the plaintiff had not been employed a month for which she would have any accruals.  Likewise, as a durational employee,

the plaintiff possessed no other accruals against which to credit her absence.  The defendant

misconstrued the Employee Dependability Policy by applying it to the plaintiff's absence on

February 3, 2014, *Defendant's Exhibit 3.*  Since she had no sick leave accruals as of February 3,

2014, the plaintiff did not violate the defendant's policy by exhausting her sick leave accrual; she

had none to exhaust.  Similarly, the second counselling notice, *Defendant's Exhibit 4,* issued to

the plaintiff on February 19, 2014, allegedly for the plaintiff calling in sick on February 13,

2014, is a flawed application of the employee dependability policy.  On February 13, 2014, since

the plaintiff had worked a month, she would have accrued eight and three-quarters (8.75) hours

of sick time.  Therefore, on February 13, 2014, the plaintiff had not exhausted her sick time

accrual.  Even if she had exhausted her sick time accrual of eight and three-quarters (8.75) hours,

the plaintiff still did not violate the employee dependability policy, when, because of illness, she

called out sick, in compliance with the defendant's reporting procedures.  Liebel in the

counseling notices asserts that the plaintiff violated the policy "due to your exhaustion of sick

leave accrual, and your inability to follow established procedure."  *Defendant's Exhibits 3, and

4.*  The established procedure the plaintiff is claimed not to have followed, was "call[ing] out

sick without sufficient sick leave accruals to cover the absences."   Liebel never counseled the

plaintiff as to the "proper procedure" to follow, which would have been requesting that her sick

day be classified as authorized leave with pay.  A review of the policy demonstrates that the

plaintiff's absence, contrary to the defendant's contention, was not a violation of the Employee

Dependability Policy.  Even if Libel had counseled the plaintiff after the first occurrence, he still

had no basis to issue her a written reprimand on April 3, 2014.  The policy explicitly states that

"A. First Occurrence.  The employee shall be charged with unauthorized leave and *counseled

regarding proper procedure*."  (Emphasis added).  Liebel never counseled the plaintiff regarding

the "proper procedure," which in the plaintiff's case, as mentioned above, would simply have been to request authorized leave without pay. *Defendant's Exhibit 24, DOC, Administrative Directive, 2.11, Section 10.* Not counseling the plaintiff on the proper procedure to follow after the alleged first occurrence, the defendant could not then proceed to the next step and issue the plaintiff a written reprimand. As the counseling memorandums clearly demonstrate, the plaintiff was never counseled as to the "proper procedure" for requesting her absences be categorized as authorized leave without pay. *Defendant's Exhibit 24, DOC, Administrative Directive, 2.11, Section 10; Defendant's Exhibit 3, and Defendant's Exhibit 4.* Noticeably absent from the February 19, 2014, Memorandum is any notice to the plaintiff that she had the option to request that her absence be listed as an authorized absence without pay. *Defendant's Exhibit 4.*

In the same manner, the defendant mischaracterizes the plaintiff's absences on May 24, 2014, through May 29, 2014, as being violations of the defendant's absenteeism policy. Most egregious, the labeling of the plaintiff's absence on May 29, 2014, as a no-call, no-show, when she was in the hospital, as the defendant was fully aware, because she had miscarried, is a clear demonstration of the defendant's retaliatory behavior. *O'Donnell Tr. 73:14-79:5; 128:20-130:4.* The defendant bases its decision not to allow the plaintiff to return to her per diem position on the erroneous contention that the plaintiff had five or more unauthorized absences during her durational assignment. The defendant labelled the plaintiff's absences as unauthorized solely as the result of its failure to counsel the plaintiff about the procedure that could have been employed to have the plaintiff's absences listed as authorized leave. *Defendant's Exhibit 24, DOC, Administrative Directive, 2.11, Section 10; O'Donnell Tr. 73:14-79:5; 128:20-130:4.* A jury could reasonably determine that the reason for terminating the plaintiff's employment, unauthorized absences, was a pretext to cover up the unlawful retaliation to which the plaintiff

19

was subjected by the defendant.  Similarly, a jury could find that the failure of the defendant to advise the plaintiff that she had the right to appeal the designation of her resignation as not in good standing was part of its effort to cover up its retaliatory conduct.  The defendant ignored the explicit requirements of Section 5-243-1 of the Regulations of Connecticut State Agencies, when Logan failed to inform the plaintiff of her right to file an appeal from Logan's designating the plaintiff's resignation as "not in good standing."  *Defendant's Exhibit 12.*

### 3.   *Overall Finding of Unlawful Retaliation*

In the very least, the plaintiff has not only proved a prima facie case of unlawful retaliation, but has raised issues of fact regarding the truth of the defendant's reasons for terminating the plaintiff.  A jury could certainly find that the defendant indulged in distortions and untruths when describing the plaintiff's absences, and knowingly indulging in specious innuendo about the plaintiff's attire at work.  This evidence would allow a reasonable juror to find for the plaintiff on her claim that she was the victim of unlawful retaliation. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-148, 120 S.Ct. 2097, 2108 – 2109 (2000) (Internal citations and quotations omitted in part). "[T]he Court recognizes that 'smoking guns are rarely left in plain view,' *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 112 (2d Cir.2001), in these cases and that '[e]mployers are rarely so cooperative as to include a notation in the personnel file' that the firing is for a reason expressly forbidden by law.' *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464-65 (2d Cir.1989) (internal quotation marks omitted). Furthermore, the Second Circuit has recognized that in the appropriate case, evidence satisfying McDonnell Douglas's minimal requirements of a prima facie case plus

evidence from which a fact finder could find that the employer's explanation was false may be enough to present the case to a jury. *James v. New York Racing Ass'n*, 233 F.3d 149, 157 (2d Cir.2000)". Kourofsky v. Genencor Intern., Inc., 459 F.Supp.2d 206, 214 (W.D.N.Y.,2006). "Once Elyria met its burden of production, the court's task, at the summary judgment stage, was to determine whether there was a legally sufficient basis for a reasonable jury to find that Elyria's reasons were pretextual and that Elyria intentionally discriminated against Peck because of her sex. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). A question of fact remains if a jury could reasonably conclude based on the evidence that Elyria's 'legitimate reasons . . . were not its true reasons, but were a pretext for discrimination.' Id. at 143 (quotations omitted). In other words, the question is whether the employer's stated reason were its true reasons, or were, instead, phony ones offered later to cover up discrimination. In assessing pretext, a jury is free to consider the evidence establishing Peck's prima facie case, and 'inferences properly drawn therefrom.' Id. A jury's 'disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.' Hicks[5], 509 U.S. at 511. Thus, if a jury could reasonably reject Elyria's proffered reasons, it would be permitted to 'infer the ultimate fact of intentional discrimination.' *Id. Peck v. Elyria Foundry Co.,* 347 Fed. Appx. 139, 145 (6th Cir. 2009). "[E]mployers generally are entitled to make their wn assessments regarding applicants' qualifications and the relative merits of different applicants. *Ottman v. City of Independence*, 341 F.3d 751, 757-58 (8th Cir. 2003). That having been said, all Willnerd must do to avoid summary judgment is create a jury question as to the issues of pretext for discrimination. On the present record, given the paucity of

---

[5] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

information detailing what precisely First National considered relevant experience and the lack of any clear superiority in the other applicant's qualifications, we believe a jury could find the proffered rational to be pretextual…If a jury doubts the employer's offered reasons, it can base a finding of intentional discrimination on a combination of the prima facie case and its doubt of the employer's reason, especially if the doubt is 'accompanied by a suspicion of mendacity.'" *Willnerd v. First Nat'l Neb., Inc.,* 558 F.3d 770, 783 (8th Cir. 2009) (Internal citation and quotation marks omitted).

Although the plaintiff must do more than simply prove a defendant's explanation for terminating her is false, she still can succeed on her claim of unlawful retaliation by proving the elements of her prima facie case along with establishing the falsity of the reasons offered by the defendant for terminating her employment. "Before analyzing the facts of this case, this Court must first address the legal issue raised by Defendants' reply. As Defendants correctly note, *McDonnell Douglas* requires a plaintiff to do more than prove that a defendants' proffered explanation for an adverse employment action is false. See, e.g., *Renz v. Grey Advertising, Inc.*, 135 F.3d 217, 222 n. 3 (2d Cir. 1997) ('[A] discrimination plaintiff may not succeed by proving only that a proffered explanation is false'); *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F. 3d 116, 121 (2d Cir. 1997) (plaintiff must prove both that the defendant's proffered reason was false, and that discrimination or retaliation was the real reason). The ultimate burden of persuasion is always on the plaintiff, who must demonstrate that the employer's action was prompted by an impermissible motive. See *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511-12, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (citing Tex. Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). However, the Supreme Court has held that '[t]he factfinder's disbelief of the reasons put

forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.' *Hicks*, 509 U.S. at 511. Under these circumstances, '[r]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination' or other impermissible motive. *Id.*" *Voltaire v. Home Servs. Sys.*, 2011 U.S. Dist. LEXIS 115081, 44-46 (E.D.N.Y. Sept. 30, 2011).


                    THE PLAINTIFF – SHAWNEE O'DONNELL


                    BY:  /s/<u>Thomas W. Bucci</u>
                    Thomas W. Bucci, Esq.
                    Federal Bar No. ct07805
                    WILLINGER, WILLINGER & BUCCI, P.C.
                    855 Main Street
                    Bridgeport, CT 06604
                    Tel. No. (203) 366-3939
                    Fax No. (203) 337-4588
                    Email: thomasbucci@earthlink.net

**<u>Certificate of Service</u>**

I hereby certify that on January 23, 2017, a copy of foregoing *Memorandum in Opposition to Motion for Summary Judgment* was filed electronically and served on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

THE PLAINTIFF – SHAWNEE O'DONNELL

BY: /s/Thomas W. Bucci
Thomas W. Bucci, Esq.
Federal Bar No. ct07805
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT 06604
Tel. No. (203) 366-3939
Fax No. (203) 337-4588
Email: thomasbucci@earthlink.net